# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

JEN AUSTIN, individually and
AUSTIN MARKETING, LLC,

      Plaintiffs,

v.                                Case No: 8:20-cv-1472-KKM-TGW

METRO DEVELOPMENT GROUP, LLC, et al.,

      Defendants.

_____

## ORDER

Plaintiffs Jen Austin and Austin Marketing, LLC, bring five claims against Defendants Metro Development Group, John Ryan, and a variety of Defendants related to Metro. They claim that they are entitled to unpaid wages under Florida common law and to damages under 26 U.S.C. § 7434, the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), the Florida Whistleblower's Act (FWA), and Florida defamation law. Defendants move for summary judgment on several counts and request that, if the Court grants summary judgment in their favor on the only federal question, it declines to exercise supplemental jurisdiction over the remaining counts arising under state law.[1] The Court

---

[1] Defendants have urged the Court to decline supplemental jurisdiction since the early stages of this case. (Doc. 10 at 1–2 ("[T]he exercise of supplemental jurisdiction over the remaining Florida state law claims is not automatic and should be declined.").

grants summary judgment on the 26 U.S.C. § 7434 claim (Count I) and dismisses without prejudice Plaintiffs' state law claims (Counts II–V).

## I.   BACKGROUND

Jen Austin performed marketing work for Metro Development Group, LLC, and the entities that Metro supports between June 2014 and April 2020. Austin contends that Metro hired her as an employee but then told her that Metro would classify her as an independent contractor. (Doc. 109 at 2.) To be compensated as an independent contractor, Austin formed Austin Marketing, LLC, the entity which received payment from Metro and the entities Metro supports. (Doc. 99-1 at 215.) Austin testified in her deposition that she complained multiple times to Defendant John Ryan about being classified as an independent contractor. (Doc. 99-1 at 118, 121.) Ryan testified in his deposition that he did not remember Austin asking to be an employee. (Doc. 99-2 at 83, 86–88.) During her time at Metro, Austin alleges she would submit expense reports to Metro along with documentation that showed the expenses were business-related per Defendants' "accountable plan." (Doc. 21 at ¶ 32.)

Austin stopped working for Defendant in April 2020, after a dispute arose over Austin's request to hire an independent contractor to perform marketing and social media work. (Docs. 99-1 at 152–56, 193; 99-2 at 93–95.) Austin claims that she was fired during

a private meeting with Defendant Ryan; Ryan claims he never fired her. (Doc. 99-1 at 193;

Doc. 99-2 at 93–95.)

Austin then commenced this suit on June 27, 2020. (Doc. 1.) She brought five

claims, naming Metro and its CEO, John Ryan, as Defendants. After the Court dismissed

Count I with leave to amend, Plaintiff Austin filed the Amended Complaint, adding

Austin Marketing, LLC, as an additional plaintiff and the sixteen entities that Metro

supports with management services as additional Defendants. (Doc. 21.) The Court then

dismissed Count I of the Amended Complaint in part, concluding that Austin was not

individually injured by any fraudulent tax forms and therefore lacked standing.[2] (Doc. 75.)

But the Court permitted Count I to proceed by Austin Marketing against Defendants.

The Court also dismissed the claims in Count I against Defendants Dune FL Land I Sub,

LLC, and Dune FB Debt, LLC, for failure to state a claim for relief against them under

26 U.S.C. § 7434. (*Id.*)

Defendants now move for summary judgment in their favor on Counts I, III, and

IV, and partial summary judgment on Count II of the Amended Complaint. Because the

Court grants their motion on Count I and concludes that it should not exercise

---

[2] The parties have not sought to relitigate the rulings entered earlier in the case, before the undersigned inherited it. Thus, I will not revisit the orders concerning the motions to dismiss. Specifically, I do not decide whether the Court's earlier rulings about lack of "standing" by Austin in Count I constitutes a lack of Article III standing or means she simply is not "within the class of plaintiffs whom Congress has authorized to sue under [§ 7434]." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014); *see also Baker v. Batmasian*, 730 F. App'x 776, 777 n.1 (11th Cir. 2018). But I note that the latter seems better suited to the facts as alleged and arguments presented.

supplemental jurisdiction over Plaintiffs' state law claims between non-diverse parties, it denies without prejudice the motion for summary judgment as to Counts II, III, and IV. The Court also dismisses without prejudice Counts II, III, IV, and V. The parties may litigate the merits of these claims in state court, if Plaintiffs elect to refile them there.

## II.   MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A moving party is entitled to summary judgment when the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must "go beyond the pleadings and her own affidavits" and point to evidence in the record that demonstrates the existence of a genuine issue for trial. *Id.* at 324 (quotation omitted). The Court reviews all the record evidence and draws all legitimate inferences in the nonmoving party's favor. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192–93 (11th Cir. 2004).

## B. Analysis

"If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return." 26 U.S.C. § 7434(a). Austin Marketing alleges that Defendants violated § 7434 when they willfully misclassified it as an independent contractor and issued information returns with incorrect amounts "for some of 2017 and all of 2018 and 2019." (Doc. 21 at ¶¶ 91, 104.)

To prove a claim under § 7434, a plaintiff must establish "(1) that the defendant issued information returns; (2) the information returns were fraudulent; and (3) defendant willfully issued the returns." *Dorseli v. Gonzalez*, No. 2:17-CV-37-FTM-99CM, 2017 WL 4286482, at *3 (M.D. Fla. Sept. 27, 2017) (Steele, J.). A plaintiff must prove the second and third elements by clear and convincing evidence. *See Sigurdsson v. Dicarlantonio*, No. 6:12-CV-920-ORL-TBS, 2013 WL 12121866, at *6 (M.D. Fla. Dec. 11, 2013) (Smith, Mag. J.); *Carlson v. United States*, 754 F.3d 1223, 1226 (11th Cir. 2014). An "information return" is "any statement described in section 6724(d)(1)(A)." § 7434(f). Defendants concede that the Forms 1099 fit the definition of "information returns" because they report "nonemployee income." (Doc. 100 at 3.) Defendants further acknowledge that the Court has already decided that the Forms 1099 were issued by Defendants. (*Id.* at 3–4 (citing Doc. 75 at 5).) At this stage, the Court must only determine

5

whether the information returns were fraudulent by including reimbursed expenses and, if fraudulent, whether a reasonable jury could find that Defendants willfully issued the fraudulent returns.[3]

Plaintiff Austin Marketing alleges that Defendants, under the direction of Defendants Ryan and Metro, issued 1099s that were fraudulent because they labeled Austin Marketing an independent contractor when it should have been an employee and because they reported reimbursed expenses as gross income. Defendants move for summary judgment on the basis that misclassification does not give rise to a claim under § 7434, that it was not fraudulent or inaccurate to include reimbursements in the 1099s to Austin Marketing, and that Austin Marketing fails to put forward sufficient evidence of willfulness. The Court agrees with Defendants and grants summary judgment against Austin Marketing on its § 7434 claim.

---

[3] Per the Amended Complaint, one of the Defendants filed a Form 1099 that included compensation which Austin Marketing claims it never received. But it appears there was no actual misstatement of compensation. Plaintiffs allege that Defendant Dune FB, LLC, paid Austin Marketing nothing in 2017 but listed $12,739.75 in its Form 1099 for that tax year. One line above, Plaintiffs allege that Defendant Dune FB Debt, LLC, paid Austin Marketing $12,739.75 but did not report any payment on the Form 1099 (or did not file a Form 1099). (Doc. 21 at ¶ 74.) Earlier in the Amended Complaint, Plaintiffs noted that there was no filing with the Florida Secretary of State for Dune FB, LLC, and Dune FB Debt, LLC, and Dune FB, LLC, share the same Tax Identification Number. (*Id.* at ¶ 15 n.1.) It appears that there was no misstatement of payments; instead, a cleric made an error in omitting "Debt" from the name of the payor in filing the Form 1099 from Dune FB Debt, LLC, for tax year 2017.

### a. Austin Marketing Cannot Obtain Relief Under § 7434 for Misclassification.

Austin Marketing alleges the 1099s were fraudulent because it was considered an independent contractor when it was really an employee. Defendants counter that Austin's individual claim that Defendants violated § 7434 was already dismissed and that Austin Marketing cannot state a claim based on misclassification. The Court agrees. Because the Court earlier ruled that Plaintiff Austin lacked standing for her § 7434 claim, only Plaintiff Austin Marketing's § 7434 claim remains. (Doc. 75 at 5–6.) Austin Marketing cannot obtain relief under § 7434 for any misclassification as an independent contractor because the statute limits relief to information returns that include fraudulent information about the payments made to the recipient.

Section 7434 provides a civil action when any person files a fraudulent information return "with respect to payments purported to be made to any other person." § 7434(a). The text informs the reader that the fraud—i.e., the "knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment"[4]—concerns the "payments" made to the recipient. Indeed, the Supreme Court has interpreted the phrase "with respect to" to mean exactly that: the object of the prepositional phrase—here, "payments purported to be made"—constrains what comes

---

[4] *Fraud*, *Black's Law Dictionary* (11th ed. 2019).

before the prepositional phrase—here, "fraudulent information return." *See Collins v. Yellen*, 141 S. Ct. 1761, 1780–81 (2021) (confining the "rights of . . . [a] stockholder" to those rights a stockholder holds "with respect to the regulated entity" (quotation omitted)). So any misclassification of an employee as an independent contractor by issuing a 1099 instead of a W-2 falls outside of the plain text of the civil cause of action created by § 7434. *See Butler v. Enter. Integration Corp.*, 459 F. Supp. 3d 78, 106 (D.D.C. 2020) (Nichols, J.) ("Plaintiffs cannot state a claim against Defendants under § 7434 merely for mischaracterizing them as independent contractors rather than employees or owners and thereby filing the wrong tax form."). Only claims for fraudulent amounts of payments may proceed.

Although neither party identifies an appellate opinion holding that § 7434 actions can be premised only on fraudulent amounts of payments, well-reasoned district court decisions concur.[5] *See Tran v. Tran*, 239 F. Supp. 3d 1296, 1297 (M.D. Fla. 2017) (Merryday, J.); *Liverett v. Torres Advanced Enter. Sols. LLC*, 192 F. Supp. 3d 648, 650 (E.D. Va. 2016) (limiting it to an information return that was "false or misleading *as to*

---

[5] This Court noted in its earlier order dismissing in part Austin's § 7434 claim that the Eleventh Circuit has not yet decided whether misclassification of an employee as an independent contractor is sufficient to state a claim under § 7434. (Doc. 75 at 6 (citing *Baker*, 730 F. App'x at 780 n.8).) The Court avoided then deciding whether a claim under § 7434 could be stated for misclassification because it ruled that Austin's claim alleged both misclassification and inflated income. (Doc. 75 at 6.) But Austin's allegations of both misclassification and inflated income must now be analyzed separately. A person might willfully misclassify someone but not willfully inflate payment on an information return, so the Court must assess the two claims independently.

*the amount of payments* purportedly made") (emphasis added); *Sirin v. Portx, Inc.*, No. CV 20-7853 (SRC), 2020 WL 6194018, at *6 (D.N.J. Oct. 22, 2020) (same). Allowing civil actions premised on any false information in an information return would "render[] superfluous the phrase 'payments purported to be made.'" *Tran*, 239 F. Supp. 3d at 1297. And the phrase "payments purported to be made" clarifies that actionable information returns are ones only where the return fraudulently—that is, inaccurately or misleadingly—reports the amount a payer gave to a payee.

Other district courts have also noted that allowing an action premised on a misclassification would ignore the meaning of "information return." *See Liverett*, 192 F. Supp. 3d at 653. Section 7434(f) defines "information return" as any statement described in 26 U.S.C. § 6724(d)(1)(A), which in turn defines "information return" as "any statement of the *amounts of payments* to another person required by" nine statutes. (emphasis added). Thus, a civil action under § 7434 premised on misclassification simply cannot be squared with section (a), which permits a civil action when someone "files a fraudulent [statement of the amounts of payments] with respect to payments purported to be made to another person." The fact that Austin Marketing alleges that the 1099s were fraudulent as to both the amounts and Austin's employment status is of no consequence. The statute only gives liability for a person who "willfully files a fraudulent information return with respect to

9

payments purported to be made," not for any willful filing of an information return instead of a W-2.

Finally, any argument that the misclassification was incorrect because proper classification would have resulted in W-2s, which might not have included reimbursed expenses, also fails. Only Austin Marketing brings Count I, but § 7434 states that a person may bring a civil action for damages when *that person* was issued wrongful information returns. It would be incoherent for Austin Marketing to allege that it should have received W-2s (that would have excluded reimbursed expenses) because no one can issue Austin Marketing a W-2. *See* 26 C.F.R. § 31.6051-1(a)(1)(i)(B) (noting that W-2s must include the social security number of the employee); 20 C.F.R. § 422.104 (listing who is eligible for a social security number without mentioning legal or non-natural persons).

Section 7434 permits a civil action premised solely on fraudulent amounts of payment, not on an incorrect classification as an independent contractor, so any argument that the latter constitutes the fraud here fails as a matter of statutory interpretation. Moreover, because only Austin Marketing brings the § 7434 claim, it cannot maintain a § 7434 claim premised on the information return improperly labeling it an independent contractor, as it cannot be an employee entitled to a W-2.

10

## b. The Form 1099s Properly Included Reimbursements for Business Expenses.

Plaintiff Austin Marketing also claims that the information returns Defendants filed were fraudulent because they inflated Austin Marketing's income by including reimbursed expenses. Defendants move for summary judgment on this score, arguing that there was nothing legally improper about including those reimbursements as part of "gross income." (Doc. 100 at 4 (quotation omitted).) Defendants also argue that, at this stage, Austin Marketing must cite to a "statute, regulation or other authority which prohibits" the inclusion of the reimbursed expenses to establish that they were fraudulent to include. (*Id.*) Austin Marketing responds that the parties' experts "disagree on a material issue of fact: whether reimbursed expenses should have been included on the 1099[s]." (Doc. 109 at 8.) Although the experts disagree, that alone does not render this issue a dispute of material *fact*. Instead, whether the law permits inclusion of reimbursed expenses as gross income on the Form 1099s so as to make them fraudulent is a question of law. *See Fabry v. Comm'r*, 223 F.3d 1261, 1263 (11th Cir. 2000) (holding that the interpretation of the Internal Revenue Code is a question of law).[6] In the absence of Austin Marketing providing any

---

[6] The Court is not persuaded by Plaintiffs' argument to the contrary. In addition to citing cases that permit misclassification to constitute a violation of § 7434, they also cite a case which concludes that experts' disagreement on whether certain payments were "wages" or "capital gains" creates a material issue of fact. *See Pitcher v. Waldman*, No. 1:11-CV-148, 2012 WL 5269060, at *6 (S.D. Ohio Oct. 23, 2012), *report and recommendation adopted*, No. C-1-11-148, 2013 WL 866510 (S.D. Ohio Mar. 7, 2013). But that court did not state whether the experts' opinions created a material issue of fact because of a dispute of the facts related to the payments or because of a dispute about whether the law governing taxation would consider the payments as income or capital gains. Here, there is no disagreement about the amounts of the

legal analysis to support its position and after an independent review, the Court concludes that nothing clearly prohibited nor required Defendants to include reimbursed expenses in "gross income" and thus it cannot be considered materially misleading or fraudulent to include them. The Court thus agrees with Defendants that Austin Marketing has failed to establish that the inclusion of reimbursed expenses for the tax years at issue made them materially misleading as a matter of law.

Start with § 7434. As described above, an information return under § 7434 is any statement described in § 6724(d)(1)(A). Section 6724(d)(1)(A) includes a "statement of the amounts of payments to another person required by" 26 U.S.C. § 6041(a). Section 6041(a) requires that "[a]ll persons engaged in a trade or business and making payment . . . to another person, of rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable gains, profits, and income . . . shall render a true and accurate return, . . . setting forth the amount of such gains, profits, and income." Thus, the Forms 1099 issued to Austin Marketing must include all "gains, profits, and income" it received from Defendants. That raises the question then whether reimbursed expenses may be considered "income."

---

reimbursed expenses (at least not in a material sense) or whether they were or were not included. Instead, the parties' experts debate the legality of including the expenses at all for certain tax years. That argument renders it a quintessential legal question, not a fact question for the jury.

Defendants point to 26 U.S.C. § 61(a) and 26 C.F.R. § 1.6041-1(f)(1) for support that nothing prohibited inclusion of reimbursed expenses on Forms 1099 issued to Austin Marketing as part of the income it received.[7] Section 61(a) provides that "gross income means all income from whatever source derived" and 26 C.F.R. § 1.6041-1(f)(1) explains that "[t]he amount to be reported as paid to a payee is the amount includible in the gross income of the payee (which in many cases will be the gross amount of the payment or payments before fees, commissions, expenses, or other amounts owed by the payee to another person have been deducted)." § 1.6041-1(f)(1); (Docs. 100 at 4; 102-6 at 1–2). Together then, the amount of gross income may include "expenses" even if those expenses may later be deducted. *See* § 1.6041-1(f).[8] Of course, the language of this regulation is ambivalent to an extent, explaining that "in many cases" expenses may be included, but not explicitly requiring in all cases or delineating when those cases arise.

---

[7] Defendants' experts also argue that "[t]axpayers are generally required to report a broader category of payments as income to independent contractors." (Docs. 102-6 at 2.). In support, they cite 26 C.F.R. § 1.6041-3(h)(1). That regulation notes that an employer is not required to include expenses reimbursed under an accountable plan. This section does not apply to Austin Marketing, which was never able to participate in Metro's accountable plan for tax purposes. Amounts "treated as paid under an accountable plan . . . are not reported as wages or other compensation on the employee's Form W-2," 26 C.F.R. § 1.62-2(c)(2)(4), but as noted above, only a natural person can file a W-2. *See* 26 C.F.R. § 31.6051-1(a)(1)(i)(B); 20 C.F.R. § 422.104. The negative implication (although not explicit) of this regulation is that a payor may include reimbursed expenses for a non-employee.

[8] And it appears that Austin Marketing did deduct at least some of its expenses in its amended tax returns. (Doc. 99-7 at 11 (deducting the reimbursed expenses for tax year 2018).) Austin Marketing does not dispute that they deducted the expenses, but argues that those deductions are irrelevant and do not render the original 1099s proper.

13

Austin Marketing does not directly engage with this IRS regulation about what *may* be included in the gross income for 1099s. Instead, it points to its expert's opinion that only "remuneration for services performed" should be included in non-employee compensation.[9] (Doc. 109 at 7.) But at least part of its expert's conclusions are incorrect as a matter of law. The expert opines that Austin Marketing was reimbursed under an "Accountable Plan" and expenses reimbursed under such a plan are excluded from wages. (Doc. 97-1 at 21.) But only *employees* can use an accountable plan to reduce their taxable income. *See* 26 C.F.R. § 1.62-2(c)(2)(4) ("Amounts treated as paid under an accountable plan are excluded from the employee's gross income, are not reported as wages or other compensation on the employee's Form W-2, and are exempt from [certain taxes] . . . ."). Although a central question of this case is whether Defendants misclassified Austin as an independent contractor when she was really an employee, that question is irrelevant to whether the Form 1099s that Austin Marketing received were fraudulent because they did not exclude reimbursements through an accountable plan. Austin Marketing, as a non-natural person, was never eligible to use Defendants' accountable plan.

---

[9] Plaintiffs' expert cites 26 U.S.C. § 6041A(a)(1) to support her conclusion that only "remuneration for services performed" should be included in non-employee compensation. (Doc. 97-1 at 22 & n.5.) But that statute describes only one of the kinds of "gains, profits, and income" that a payor must report when making an information return. No part of the statute undermines the overarching requirement of § 6041 that a payor report "the amount of [an independent contractor's] gains, profits, and income" from the payor. § 6041(a). Before this statute would prohibit the inclusion of reimbursed expenses, Plaintiff Austin Marketing would need to show that the only "gains, profits, [or] income" it received from Defendants was remuneration.

14

Austin Marketing also notes its expert's reliance on "the instructions"—which the Court construes as a reference to the IRS instructions about how to complete a Form 1099-NEC—and states that those "provide that reimbursed expenses are *not* to be included in the 1099 form." (Doc. 109 at 7, referring to Ex. 7 of Bastian Supplemental Report, Doc. 97-9.) Without additional explanation, the Court is left to review the expert's supplemental report to determine which portion of the instructions its expert relies upon to reach her conclusion. There are several options, none of which unequivocally required Defendants to exclude reimbursed expenses. First, the general instructions direct the payor to include non-employee compensation exceeding $600 for "services performed by someone who is not your employee (including parts and materials)." (Doc. 97-9 at 3.) But that direction explicitly contemplates that income could include things like reimbursements for "parts and materials" that are not themselves the services performed. Second, the instructions state that "[s]ome payments do not have to be reported on Form 1099-NEC, although they may be taxable to the recipient." (Doc. 97-9 at 4.) Plaintiff's expert points to the exemption for payments to a corporation[10] and for merchandise and similar items. (Doc. 97-8 at 14.) Nothing in the instructions bars a payor from providing a Form 1099-NEC for these payments; permitting one not to do something is not the same as mandating that

---

[10] If Plaintiff's expert intends to insinuate that no Form 1099s should have been filed at all because Austin Marketing is an LLC, that is not an argument that Austin Marketing presses in its response to the motion for summary judgment.

15

that the Internal Revenue Manual "does not have the force and effect of law but provides only direction and guidance"). It has not done so.

In addition to Austin Marketing's failure to show how inclusion violated the law as to make the Form 1099s fraudulent, the ordinary meaning of "adjusted gross income" accommodates the deductions a person or company makes to gross income. But gross income, unadorned, does not account for reductions that the law permits—it is merely an attempt to capture all the money that a person acquired in the applicable time period. Thus, when a company purchases products or services related to work and receives reimbursements for them, those reimbursements go into the pool of money the company received that year and constitute a portion of its gross income. But they also are permissible deductions as ordinary business expenses, thus offsetting tax liability for the higher reported gross income caused by the inclusion of the reimbursed expenses. *See* 26 U.S.C. § 162(a) ("There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . ."). Indeed, that is exactly what Austin Marketing did when it filed its amended returns for the tax years at issue such that inclusion of the reimbursed expenses did not trigger additional tax liability once Austin Marketing took its allowable deductions. (*See* Doc. 99-7 at 11 (noting Austin Marketing deducted the reimbursed expenses as business expenses for the 2018 tax year and thereby decreased its ordinary business income proportionally).)

17

### c. Austin Marketing Fails to Establish Willfulness

In the alternative, even if the law required exclusion of the reimbursed expenses such as to make them fraudulent (i.e., materially misleading), Austin Marketing must put forth sufficient evidence for a jury to find by clear and convincing evidence that Defendants were "aware of the duty purportedly imposed by Section 7434[ and] specifically intended to flout the statute." *Tran*, 239 F. Supp. 3d at 1298. In other words, it must show sufficient evidence for a reasonable jury to conclude that the Related Entities acted "willfully" when filing the fraudulent returns. *See* § 7434. Austin Marketing has failed to do so, and Defendants are entitled to summary judgment on Count I for this reason as well.

Willfulness requires more than mere knowledge that an information return was false. *See Tran*, 239 F. Supp. 3d at 1298. Instead, "the plaintiff must show that the defendants, *aware of the duty* purportedly imposed by [the tax law], specifically intended to flout th[at] statute." *Id.* (emphasis added) (citing *Cheek v. United States*, 498 U.S. 192, 201–02 (1991)).[13] The willfulness burden, thus, remains quite high. And Austin Marketing must prove by "clear and convincing" evidence that Defendants were aware of the duty not to include the reimbursed expenses and specifically intended to flout whichever tax statute

---

[13] Although some cases could be read to suggest otherwise, the Court doubts that willfulness in this context requires a plaintiff to show that a defendant knew that § 7434 penalized filing fraudulent information returns before a defendant can be found liable under that section. Instead, § 7434 likely permits a plaintiff to recover where a defendant files an information return knowing it is incorrect according to substantive tax law and disregards that prohibition nonetheless. The parties argue the issue of willfulness under the latter understanding.

or regulation forbids their inclusion. *See Sigurdsson*, 2013 WL 12121866, at \*6; *Cavoto v. Hayes*, 8-C-6957, 2010 WL 2679973, at \*4 (N.D. Ill. 2010); *see also Carlson*, 754 F.3d at 1226 ("Under the Eleventh Circuit's longstanding precedent, the Government must prove fraud in civil tax cases by clear and convincing evidence.").[14]

Although intent is often proved circumstantially, Austin Marketing's evidence is so scant that no reasonable jury could find by clear and convincing evidence in its favor. Rather, its arguments amount to mere speculation that cannot give rise to an inference that satisfies its burden of proof, especially in the light of the undisputed evidence that Defendant Metro's accounting department, who provided accounting services for all the other defendant companies in this case, (Docs. 21 at ¶ 102; 99 at ¶ 11), prepared the information returns based on the advice of outside auditors.[15] (Doc. 99 at ¶ 58.)

---

[14] The "clear and convincing" evidence standard used in the Eleventh Circuit can be traced to the Supreme Court's use of the standard in 1929, when deciding the standard for a "proceeding for a turnover order in bankruptcy," which the Court compared to a charge of fraud, which "must be established by the same kind of evidence required in a case of fraud in a court of equity." *Oriel v. Russell*, 278 U.S. 358, 362 (1929). The standard thus flows from common law standards of proof. But the Supreme Court later cast doubt on the use of common law practices for determining the standard of proof in a civil fraud action because "historical considerations underlying the imposition of a higher standard of proof ha[d] questionable pertinence [t]here." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 388 (1983). Nonetheless, even after that equivocation, the Eleventh Circuit has reaffirmed the "clear and convincing" standard as recently as 2014. *See Carlson*, 754 F.3d at 1226. Because *Herman* was decided in 1983 and only suggested that the standard might be incorrect and because the Eleventh Circuit has since used the standard, the Court applies it here.

Moreover, the Court is unaware of any persuasive reason why the government's burden of proof in a civil tax fraud case would differ from a private plaintiff's burden of proof in a civil tax fraud case.

[15] Plaintiffs do not dispute this. Although they note that there is conflicting testimony of two employees in the accounting department at Defendant Metro as to who internally made the decision to include or exclude reimbursed expenses, (Doc. 109 at 6–7), they do not provide any evidence disputing that those employees in the accounting department relied on outside accountants in making their decision.

19

To prove willfulness, Austin Marketing relies heavily on two things. The first, that Defendants "took this action to avoid paying taxes, employee benefits, and other obligations of an 'employer' under the law." (Doc. 109 at 8.) Whether that was the motive in classifying Austin as an independent contractor instead of an employee is irrelevant to the § 7434 claim for reasons discussed above. Second, Austin Marketing argues that Defendants twice changed their practice respecting the inclusion of reimbursed expenses in 1099 information returns, which shows "willfulness in intentionally including such expenses in prior years." (Doc. 109 at 9.) But without more, neither of these shifts is probative of whether Defendants knew they were prohibited from including reimbursed expenses in the 1099s and included them anyway.

First, Austin Marketing offers evidence that before 2018, Defendants did not include reimbursed expenses in 1099s for independent contractors. And then in 2017 or 2018, they started including these reimbursements.[16] This altered course could give rise to several inferences. But there is no evidence—testimonial or documentary—to make the

_____

Plaintiffs label the instructions of Defendants' outside accountants as hearsay without addressing if any exceptions apply that would make it admissible. The Court goes the next step. It considers only the effect of the outside auditors' advice on the listener, not the content of any instructions from those accountants. *See United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015) ("Generally, an out-of-court statement admitted to show its effect on the hearer is not hearsay.").

[16] Plaintiffs allege in their Amended Complaint that the practice of including reimbursed expenses began in 2017, but they offer evidence only of the practice for years 2018 and 2019 in their response to Defendants' motion. Thus, the Court assumes Austin Marketing has' abandoned any claim that the practice of including reimbursed expenses started in 2017.

inference that Defendants did so knowing it was illegal yet intending to flout the law more likely than an inference that Defendants did so for a financial reason believing it was legal. There is certainly insufficient evidence for a jury to find by clear and convincing evidence that the first inference should be made. In fact, Defendants point to undisputed evidence that the accounting department which prepared the 1099s "took the advice of the auditors and processed it that way." (Doc. 99 at ¶ 58.)[17] Without more—which Austin Marketing does not provide—no reasonable jury could infer from the mere change in practice that Defendants willfully flouted the law by filing fraudulent information returns.

Second, Plaintiffs argue that Defendants changed their practice again and stopped including reimbursed expenses in 1099s after Austin filed suit. Once again, a jury could infer several things from a post-litigation change in practice. One, that Defendants always knew they were violating the law when including reimbursed expenses and ceased now that their practice was under legal attack. Two, that Defendants thought, although permitted, the law did not require including the expenses and it was preferable to avoid additional exposure in litigation. Or three, that Defendants thought they could include reimbursed expenses before but learned later that the law did not permit it and thus stopped violating

---

[17] The Court acknowledges that this evidence of reliance on the auditors' advice, without inclusion of what those auditors told Defendants, carries less weight in raising a good faith defense than had counsel not objected to disclosure of that advice during the depositions. Additionally, admission of that underlying testimony would presumably be for its effect on the listener, not for the truth of the underlying tax advice, and thus the Court could have considered it without running afoul of hearsay rules. *See Rivera*, 780 F.3d at 1092.

the law in good faith. But none of these inferences is necessarily stronger than the other without some other evidence. Austin Marketing offers none. And a jury is permitted to consider Defendants' accountant's testimony that she found it "a little confusing" whether to include the reimbursed expenses, prompting her to "reach[] out to the controller and the auditors, just to get a clear answer." (Doc. 99 at ¶ 59.) Nor does Austin Marketing explain how this change of course is admissible (and thus permitted to be considered at summary judgment) when its argument is essentially that the post-litigation remedial measure helps establish "culpable conduct" by Defendants. *See* Fed. R. Evid. 407 (barring admission of post-remedial measures to prove culpable conduct); *Lust v. Sealy, Inc.*, 383 F.3d 580, 585 (7th Cir. 2004) ("[T]here is no basis in the language or rationale of [Rule 407] for confining it to nonintentional torts, though they are the usual occasion for its invocation"); *Wey v. City of St. Petersburg*, No. 8:19-CV-1314-T-60JSS, 2020 WL 7024907, at *2 (M.D. Fla. Nov. 30, 2020) (Barber, J.) (excluding evidence of a new time-keeping policy which would have made the plaintiff's injury—the loss of overtime pay—less likely to have occurred).

Lastly, Austin Marketing points briefly to a couple comments by Defendant Ryan. (Doc. 109 at 9.) In response to his statement that he was unaware that reimbursed expenses were included on the 1099s issued for 2018 and 2019 and whether he should have appointed someone to investigate after Austin initiated the lawsuit, Ryan testified that "[j]ust because there's an allegation of an upset person does not warrant necessarily an

investigation," and that they "ha[dn't] investigated that yet." (Doc. 99-2 at 75–76.) This testimony fails to permit a reasonable jury to infer that Defendants knew of the duty imposed on them by § 7434 and specifically intended to "flout" it, even when combined with the two changes in behavior addressed above. *Tran*, 239 F. Supp. 3d at 1298. Although willfulness can be shown by circumstantial evidence, a reasonable jury could not infer from Defendant Ryan's acknowledgement that he thought they were correct and had not yet investigated them, that Defendants were aware that reimbursed expenses cannot be included in 1099s and included them nonetheless.

Finally, as the Court concluded above, the law on the permissibility of including reimbursed expenses on 1099s is, at best, difficult to determine. Even if the Court is incorrect that the law permits inclusion, the lack of clarity on the issue only makes it more difficult for Austin Marketing to prove willfulness. Here, Austin Marketing simply has not pointed to sufficient evidence that a reasonable jury could find willfulness by clear and convincing evidence.

### d.  Section 7434 Conclusion

Because—as a matter of law—misclassification of an employee does not constitute a violation of § 7434 and the inclusion of reimbursed expenses on Forms 1099 is not fraudulent, Defendants are entitled to summary judgment on Count I. In the alternative, even if inclusion of reimbursed expenses is not permitted as a matter of law, Plaintiff Austin

Marketing fails to put forward sufficient facts that would allow a reasonable jury to find by clear and convincing evidence that Defendants acted willfully in including those reimbursed expenses. Thus, Defendants are entitled to summary judgment on Austin Marketing's § 7434 claim.

## III.   Supplemental Jurisdiction over Remaining Claims

When Austin filed her initial complaint, she alleged a violation of 26 U.S.C. § 7434, giving this Court federal question jurisdiction to adjudicate her claim. *See* 28 U.S.C. § 1331. She also brought state claims, over which the Court elected to exercise supplemental jurisdiction.[18] *See* 28 U.S.C. § 1367.

However, now that the Court has resolved the only federal question by granting summary judgment to Defendants in Count I, the only remaining counts are state law claims.[19] And at least one of these remaining claims raises novel questions of state law. In

---

[18] The case was not before the undersigned at the time the complaint was filed or when Defendants first asked the Court in their motion to dismiss to decline to exercise supplemental jurisdiction. (Doc. 10 at 1–2.) Thus, the undersigned has not had occasion to consider whether supplemental jurisdiction is appropriate until Defendants' instant Motion.

[19] Defendants argue that Austin's FDUTPA claim is partly preempted by federal law, but this argument does not transform the FDUTPA claim into a federal question over which the Court would have original jurisdiction. And the Court will not split the claim into fragments by deciding only the portions that implicate federal law. Should Austin refile her FDUTPA claim in state court, that court will be well-equipped to address Defendants' federal preemption arguments in the first instance. This is especially true as preemption of the overpayment of federal taxes remains a straightforward argument that this Court has no doubt will quickly and easily be resolved in Defendants' favor. *See McDonald v. S. Farm Bureau Life Ins. Co.*, 291 F.3d 718, 725–26 (11th Cir. 2002) ("[T]hese statutes do not admit of a third approach, under which employees and employers would litigate benefit and taxation issues outside the statutory structure and without the presence of the very agencies created by Congress to administer this complicated system."

24

the ordinary course, where the only federal claims have been dismissed and the case is before a federal district court solely through supplemental jurisdiction, a court should decline to exercise supplemental jurisdiction. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). But before blindly applying that general rule, federal law requires a two-step process to determine whether to decline supplemental jurisdiction: first, the district court must confirm that it has discretion to decline; and second, it must consider whether prudential factors counsel against dismissal of the supplemental claims.[20]

A district court may decline supplemental jurisdiction when one of four conditions is met:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

---

(quotation omitted)); *see also Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 65 (3d Cir. 2008) (finding that federal law preempted state-law claims for tax damages suffered because of misclassification).

[20] Before Congress enacted § 1367, district courts had discretion to decline supplemental jurisdiction when prudential factors counseled against it. But "the doctrine of supplemental jurisdiction under § 1367 is less flexible than it was under" earlier Supreme Court precedent because it permits dismissal of state claims within a court's supplemental jurisdiction only if one of the four conditions outlined in the statute is met. *Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, 803 F.3d 518, 531–32 (11th Cir. 2015).

28 U.S.C. § 1367(c). Here, the Court finds that two of these conditions—each of which would be independently sufficient—have been met.[21] *See Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743 (11th Cir. 2006) ("Any one of the section 1367(c) factors is sufficient to give the district court discretion to dismiss a case's supplemental state law claims.").

First, at least one state claim raises a novel issue of Florida law: Plaintiffs' FDUTPA claim. Specifically, this Court has not identified any Florida court decision adjudicating whether a defendant who misclassifies a plaintiff as an independent contractor instead of an employee may be liable under the FDUTPA. *See Francois v. Gulf Coast Transp., Inc.*, No. 8:16-CV-1061-T-24-TBM, 2017 WL 2226647, at *4 (M.D. Fla. May 22, 2017) (Bucklew, J.) (noting that "whether an employment misclassification does in fact give rise to a FDUTPA claim under state law is a matter that should first be addressed by Florida courts"). In determining whether such misclassification can give rise to a violation of the FDUTPA, the Court would need to decide whether misclassification violates public policy in Florida or is unethical. *See Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006). Florida courts are ordinarily better positioned to decide cases of first impression

---

[21] The Court does not rely on the second condition because the Court construes that condition as one appropriate only when state claims predominate over the claims arising under the court's original jurisdiction, which requires at least one of those latter claims to remain. But, if the second condition is applicable, it would be easily satisfied in this case. The fact that there are no claims remaining that the Court has original jurisdiction over means that the state claims necessarily predominate over the non-existent claims.

26

under Florida law, particularly ones that require assessment of its State's public policy. Here, the misclassification of Austin lies at the heart of the parties' dispute. The Court therefore declines to exercise jurisdiction over the state claims as it would require it to decide as a matter of the FDUPTA whether misclassification is unethical or against Florida's public policy. *See Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, 803 F.3d 518, 536 (11th Cir. 2015) (reversing the district court's retention of a complex state claim which was "laden with important policy choices").

Second, the Court has now disposed of "the [§ 7434] claim . . . over which the district court has original jurisdiction." § 1367(c)(3). Although § 1367 uses the term "dismiss" to describe when this condition is met, the condition can still be satisfied by an order granting summary judgment over all claims which the district court had original jurisdiction. *See Michael Linet, Inc. v. Vill. of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005) (affirming the district court's ability to decline supplemental jurisdiction under § 1367(c)(3) when the court had granted summary judgment in favor of the defendant on the federal claim); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 app. A (11th Cir. 1999) ("If no federal claim survives summary judgment, the court sees no reason why the other claims should not be dismissed or remanded pursuant to 28 U.S.C. § 1367(c)(3)."); *cf. Parker*, 468 F.3d at 744 (emphasizing that a district court lacks discretion to dismiss pursuant to § 1367(c)(3) when the court grants summary judgment

27

*in favor of* the plaintiff). Because the Court has granted summary judgment for Defendants on Plaintiffs' only federal claim, § 1367 authorizes the Court to decline supplemental jurisdiction over the remaining state claims.

Since two conditions in § 1367 permit the Court to decline supplemental jurisdiction, the Court must next consider whether "judicial economy, convenience, fairness, and comity" counsel dismissal of the remaining state claims. *Ameritox, Ltd.*, 803 F.3d at 532 (quotation omitted) (referencing the factors provided in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) and *Cohill*, 484 U.S. at 350).[22] And although not automatic or mandatory, "in the usual case," once a district court has disposed of all the federal claims, "the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n.7.

Here, the factors weigh in favor of the Court declining supplemental jurisdiction. First, judicial economy would be assisted by declining jurisdiction over the remaining state claims. This is particularly true now that the Court has granted summary judgment on the only federal question. Although the Court has overseen pretrial litigation for the last

---

[22] The Eleventh Circuit has also noted that the *Gibbs* factors govern whether a court should decline jurisdiction under § 1367(c)(4), suggesting that a court's decision to not exercise supplemental jurisdiction under § 1367(c)(3) is purely discretionary. *Parker*, 468 F.3d at 745. If that is the better reading of the Eleventh Circuit's case law, the Court would still exercise its discretion to avoid ruling on an issue of first impression under Florida law.

eighteen months, it has not ruled on the merits of any of Plaintiffs' remaining state claims. Most notably, Defendants never moved for summary judgment on Count V, the claim for unpaid wages under Florida law, so that claim has never even been briefed. Moreover, the Court has not ruled on the parties' pretrial motions and no duplicative court orders would result from dismissal of the state claims. As such, this Court has not expended unnecessary resources that will need to be repeated in state court. Rather, the remaining state claims can quickly be presented for adjudication once there. *See Jacoboni v. KPMG LLP*, 314 F. Supp. 2d 1172, 1181 (M.D. Fla. 2004) (Conway, J.) (noting that the case was "in sufficient shape that it could be set for trial in state court immediately after the pleadings close; this would not present a lengthy delay").

Second, convenience to the parties does not favor retaining or declining jurisdiction. All the parties before the Court reside in Pinellas or Hillsborough County. (Doc. 21 at ¶¶ 2–21.) Because these counties share a border and are nearby the federal courthouse, the Court sees no reason why a state court in the region would not be just as convenient as the federal court. The convenience factor seems mostly in equipoise, although perhaps slightly in favor of not dismissing to avoid Plaintiffs needing to refile their state law claims.

Third, dismissal is not unfair to the parties. Defendants requested the Court decline to exercise supplemental jurisdiction over the state claims in its first motion to dismiss, which it filed in July 2020. (Doc. 10 at 1–2.) Despite Defendants' desire to not litigate

those claims in federal court, the Court exercised supplemental jurisdiction at that stage pendent to the federal question jurisdiction arising under the § 7434 claim. Defendants again raised the request not to exercise supplemental jurisdiction in its summary judgment briefing. (Doc. 110 at 5–7.) Even if Plaintiffs do not want to litigate these claims in state court now that the federal claim is resolved, the Court does not see how it would be unfair to require them to do so. The case is ready for adjudication once brought in state court, so the parties will not suffer an extended delay in getting to a final resolution. And as trial in federal court was set another month off, the parties have sufficient time to decide how best to proceed now that only some of the claims remain.

And fourth, comity with the state courts weighs very strongly in favor of declining supplemental jurisdiction over the state claims. As discussed above, the basis of Plaintiff Austin's FDUTPA claim is that Defendant Metro misclassified her as an independent contractor. But no Florida court has addressed whether the misclassification of an employee is a cognizable claim under the FDUTPA. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726. The Court will not usurp the Florida courts' opportunity to decide whether a new category of claim can be

brought under the FDUTPA. *See Francois*, 2017 WL 2226647, at *3 (declining supplemental jurisdiction for a similar reason).[23]

## IV. CONCLUSION

Defendants move for summary judgment on Plaintiffs' § 7434, FWA, and defamation claims, and for partial summary judgment on Plaintiffs' FDUTPA claim. The Court grants summary judgment in Defendants' favor on the § 7434 claim, and it declines to exercise supplemental jurisdiction over the state law claims. The Court thus dismisses without prejudice the remainder of Plaintiffs' action, including Plaintiffs' FDUTPA claim (Count II), the FWA claim (Count III), the defamation claim (Count IV), and the common law unpaid wages claim (Count V). Accordingly, the following is **ORDERED**:

1.   Defendants' Motion for Partial Summary Judgment is **GRANTED IN PART**. (Doc. 100.) Specifically, the Court concludes that Defendants are entitled to summary judgment against Plaintiffs on Count I.

---

[23] The Eleventh Circuit has also noted that district courts should consider "whether all the claims would be expected to be tried together" as one prudential factor in determining whether it should dismiss the state claims. *Palmer v. Hosp. Auth. of Randolph Cty.*, 22 F.3d 1559, 1569 (11th Cir. 1994). This factor appears to derive from *Gibbs*, where the Supreme Court noted that if "a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding," then the court likely has constitutional authority to hear the state claims with the claim over which it has original jurisdiction. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). Whether this characterization of a prudential factor is a fair reading of *Gibbs* or not, it has no applicability here where there is no federal claim remaining that the state claims can be tried alongside.

2.    Because the Court declines to exercise supplemental jurisdiction over Plaintiffs' state claims, it **DENIES WITHOUT PREJUDICE** Defendants' motion for partial summary judgment on Count II and for summary judgment on Counts III and IV.

3.    The Court **DISMISSES WITHOUT PREJUDICE** Counts II, III, IV, and V because the Court declines to exercise supplemental jurisdiction over them.

4.    The Clerk is directed to enter **JUDGMENT** in Defendants' favor and against Plaintiffs on Count I.

5.    The Clerk is also directed to terminate any other pending motions and deadlines and **CLOSE** this case.

**ORDERED** in Tampa, Florida, on December 1, 2021.

Kathryn Kimball Mizelle
United States District Judge

32